# ARMED SERVICES BOARD OF CONTRACT APPEALS

Appeal of --               )
)
Northrop Grumman Corporation   )     ASBCA No. 57625
)
Under Contract No. N68936-05-C-0059  )

APPEARANCES FOR THE APPELLANT:     Terry L. Albertson, Esq.
                                     Stephen J. McBrady, Esq.
                                     J. Catherine Kunz, Esq.
                                       Crowell & Moring LLP
                                       Washington, DC

APPEARANCES FOR THE GOVERNMENT:    E. Michael Chiaparas, Esq.
                                       DCMA Chief Trial Attorney
                                     Robert L. Duecaster, Esq.
                                       Trial Attorney
                                       Defense Contract Management Agency
                                       Manassas, VA

## OPINION BY ADMINISTRATIVE JUDGE DELMAN

In this appeal, Northrop Grumman Corporation (appellant or NGC) disputes the government's disallowance of costs for post retirement benefits (PRB)[1] under FAR 31.205-6(o). A hearing was held on entitlement only. We have jurisdiction under the Contract Disputes Act (CDA), 41 U.S.C. §§ 7101-7109.

## FINDINGS OF FACT

1. In or around December 1990, the Financial Accounting Standards Board (FASB) issued a rule or statement entitled "Employers' Accounting for Postretirement Benefits Other than Pensions," identified in this record as Financial Accounting Standard (FAS) 106, which required all companies that were covered by FASB requirements, including appellant, to account for PRB costs using a specific accrual cost method (compl. and answer ¶ 7). Thereafter, NGC used an accrual cost method under FAS 106 to measure and assign PRB costs for financial reporting purposes starting in the early 1990s, and continued to do so in its financial reporting at all times relevant in this appeal.

---

[1] NGC had a number of Plans that provided for PRB to retirees. The Plan in issue here was known as the "Northrop Retiree Medical and Life Plan" or the "Northrop Main Plan," and all future references to PRB costs or Plan costs herein refer to costs under this Plan.

Such a measurement required application of various actuarial assumptions or projections, including consideration of anticipated future health care cost increases. (Tr. 1/20)

2. Prior to 1995 and until 2006, the relevant years, for Federal income tax and government cost accounting purposes, NGC chose to measure, assign and fund PRB costs for the Plan using a different cost accrual method, conforming with the relevant provisions of the Internal Revenue Code pursuant to the Deficit Reduction Act of 1984 (DEFRA). The DEFRA methodology was also based upon actuarial assumptions or projections, but unlike FAS 106, it did not include consideration of anticipated future health care cost increases. (Tr. 1/20, 22-23) The result of this difference, all other things being equal, is that annual costs under DEFRA tend to start lower and increase over time while those costs computed under FAS 106 tend to start higher and decrease over time (compl. and answer ¶ 8).

3. With respect to the Federal Acquisition Regulation (FAR) cost regulations, prior to 1991 there was no specific provision in the FAR addressing PRB costs. After promulgation of FAS 106, subsection (o) was added to FAR 31.205-6 in 1991. This new subsection permitted accrual accounting for PRB costs, but did not specify FAS 106 or any other particular method of accrual accounting. It also required PRB costs assigned to the current year to be timely funded; those costs assigned to the current year but not funded or otherwise liquidated by tax return time were not allowable in any subsequent year. *See* FAC 90-5, effective 25 July 1991, 56 Fed. Reg. 29124 (June 25, 1991).

4. Effective 27 February 1995, the government revised FAR 31.205-6(o). Insofar as pertinent FAR 31.205-6(o)(2), as amended ("Section (o)(2)"), stated that in order to be allowable, PRB costs calculated on an accrual basis must be measured and assigned according to Generally Accepted Accounting Principles (GAAP):

> (2) To be allowable, PRB costs must be reasonable and incurred pursuant to law, employer-employee agreement, or an established policy of the contractor. *In addition, to be allowable, PRB costs must also be calculated in accordance with paragraphs (o)(2)(i), (ii), or (iii) of this section.*
>
> ....
>
> *(iii) Accrual basis. Accrual costing other than terminal funding must be measured and assigned according to Generally Accepted Accounting Principles* and be paid to an insurer or trustee to establish and maintain a fund or reserve for the sole purpose of providing PRB to retirees. The accrual must also be calculated in accordance with generally

2

accepted actuarial principles and practices as
promulgated by the Actuarial Standards Board.
[Emphasis added]

*See* 59 Fed. Reg. 67045 (December 28, 1994). It is undisputed and we find that the "Generally Accepted Accounting Principles" or GAAP referred to in (iii) above refers to FAS 106.

5. FAR 31.205-6(o)(3) ("Section (o)(3)") continued the same requirement for timely funding of PRB costs:

(3) To be allowable, costs must be funded by the time set for filing the Federal income tax return or any extension thereof. PRB costs assigned to the current year, but not funded or otherwise liquidated by the tax return time, shall not be allowable in any subsequent year.

6. Notwithstanding the new FAR requirement in Section (o)(2) that "Accrual costing other than terminal funding must be measured and assigned according to Generally Accepted Accounting Principles," appellant continued to measure, assign, and fund its PRB costs in accordance with DEFRA for government contract purposes (tr. 1/18) (*see* CAS disclosure statements below).

7. NGC regularly filed disclosure statements in accordance with CAS requirements. During the period 1995-2006, NGC's Part VII disclosure statements stated as follows: "This part covers the measurement and assignment of costs for employee pensions, post retirement benefits other than pensions (including post retirement health benefits), certain other types of deferred compensation, and insurance." Part VII was a multi-page document that contained many disclosures on the above subjects. Appellant regularly disclosed therein that it accounted for PRB costs in the Plan in accordance with DEFRA (*see* below). (App. supp. R4, tab 6; tr. 1/35-36, 43-45) The government reviewed these disclosure statements for purposes of general adequacy and compliance. *See* FAR 30.202-7(a)(b). With certain reservations taken, the government did not note any noncompliance with the CAS or the FAR (*see* below).

8. For example, by cover letter to the DCMA Defense Corporate Executive (DCE) dated 19 February 1997, appellant provided an updated Part VII using a new "form" for its disclosures and providing additional information required by the new form on actuarial and accounting practices, including those of a new division, ESSD. Appellant's disclosure statement identified, amongst other disclosures, its use of DEFRA for PRB costs of the Plan but erroneously described the Plan as one which used "cash" accounting. The government brought this matter to appellant's attention, indicating that the accounting method should have been properly described as "accrual"

3

accounting. (App. supp. R4, tabs 6-7) The government did not note any noncompliance with the FAR (tr. 1/49).

9. On 10 March 1998, NGC submitted a revised Part VII disclosure statement regarding deferred compensation and insurance cost based upon certain changes recommended by DCAA. There is no showing that DCAA's recommendations involved the disputed issues here. Appellant disclosed among its other disclosures that it measured and assigned PRB costs for its Plan in accordance with DEFRA. (App. supp. R4, tab 10 at 0281) On 13 April 1998, the DCMA DCE issued a letter to NGC stating as follows:

> I have noted no instances of noncompliance with applicable Cost Accounting Standards or with FAR Part 31 cost principles. *However, instances of noncompliance not detected during this review may be discovered during future review of your cost accounting practices. These disclosed practices shall not by virtue of such disclosure be deemed proper, approved, or agreed to practices for pricing proposals or accounting and reporting contract performance cost data.* [Emphasis added]

(*Id.* at 0265)

10. Similarly, appellant submitted a Part VII update on 5 April 1999 (app. supp. R4, tab 11) and another update dated 14 February 2000 for deferred compensation and insurance costs, both of which disclosed NGC's use of DEFRA for Plan PRB costs. In response to the latter update, the DCE issued a letter to NGC dated 20 April 2000 stating as follows:

> In response to your letter dated February 14, 2000, subject: Part VII Disclosure Statement Update and in accordance with FAR 30.602-3, I have reviewed your Disclosure Statement, Part VII revision. Based on the comments provided in DCAA Audit Report No. 4721-2000F19100002, dated 28 March 2000, I have determined that your revised Disclosure Statement Part VII adequately describes your revised cost accounting practices. Except for previously reported conditions, no instances of noncompliance with applicable Cost Accounting Standards or FAR Part 31 cost principles were noted. A cost impact proposal is not required.

4

This Disclosure Statement revision includes general information on new Northrop Grumman pension plans and to eliminate discontinued and merged pension plans. No changes to cost accounting practices as defined under FAR 52.230-2(a)(2) were noted.

*These disclosed practices shall not by virtue of such disclosure be deemed proper, approved, or agreed to practices for pricing proposals or accounting and reporting contract performance cost data.* [Emphasis added]

(App. supp. R4, tab 12 at 0306)

11. On 30 July 2003, NGC submitted another Part VII update. According to appellant's cover letter: "This revision reflects the administrative modifications and clarifications of disclosure primarily attributed to Northrop Grumman Corporation's Pension, Post Retirement Benefits and Savings Plans as agreed to with the DCAA" (app. supp. R4, tab 25 at 0508). There is nothing of record indicating that these "DCAA agreements" involved the subject disputed costs. Among many other disclosures, this updated disclosure statement described two PRB plans, one that measured and assigned costs in accordance with DEFRA (the Plan in issue here) and one that measured and assigned costs in accordance with FAS 106. In a 26 August 2003 letter to appellant the DCE stated in part as follows:

Based on a review made pursuant to FAR 30.602-3, I have determined that your revised Disclosure Statement Part VII, dated April 1, 2003 and revised July 29, 2003, adequately describes your cost accounting practices. As the practices are described, there are no instances of noncompliance with applicable Cost Accounting Standards or FAR Part 31 cost principles noted. The revisions are effective April 1, 2003.

The subject disclosure statement was revised to reflect changes and other revised disclosures regarding the disclosure of the cost accounting practices of the recently acquired Mission Systems (MS) and Space Technology (ST) business units and other revised disclosures.

(App. supp. R4, tab 26 at 0476)

12. In 2004, NGC made additional revisions to its disclosure statement "to reflect recent modifications in the company's pension plans, employee group insurance plans, employee stock ownership plans, and other insurance programs" (app. supp. R4, tab 33

5

at 0538). As far as the record shows, none of these revisions involved the subject disputed costs. Among its disclosures, appellant noted its use of the DEFRA methodology for the Plan PRB costs. The government's response, dated 28 June 2004, was similar to that made in its 26 August 2003 letter above (app. supp. R4, tab 40).

The 2006 Changes

13. In 2006, NGC decided to modify its PRB Main Plan to limit the impact of future increases in medical costs by capping its subsidy of retiree health care costs at fixed values. It also sought to obtain an advance agreement from the government accepting its prior use and its continued use of DEFRA. By letter to the DCE dated 16 May 2006, NGC stated that if the government was unable to enter into such an agreement, NGC would seek, as an alternative, an advance agreement that would document its conversion to FAS 106 accounting with amortization of the PRB transition liability over a 15-year period, with the government agreeing not to "disallow any future PRB costs on the basis of DEFRA method of accounting" used in prior years (R4, tab 3 at 16).

14. By letter dated 25 May 2006, the DCE declined to enter into an advance agreement sanctioning the use of DEFRA as requested by appellant (R4, tab 5).

15. By letter to the DCE dated 13 June 2006, NGC presented in more detail its alternative proposal, which provided for the implementation of FAS 106 for government contract purposes, effective 1 July 2006, as follows:

> The revised draft is intended to accomplish the following four objectives: *(1) It provides for the implementation of FAS 106 for Government contract purposes effective July 1, 2006.* (2) It provides for measurement of the transition obligation as of the date FAS 106 is implemented for Government contract purposes. *(3) It provides for measurement of annual PRB costs in accordance with FAS 106, and for amortization of the transition obligation [the disputed costs here] over future accounting periods using the FAS 106 delayed recognition method.* (4) It recognizes that the change is desirable. [Emphasis added]

(R4, tab 6 at 31)

16. By letter to NGC dated 24 August 2006, the DCE also declined to enter into this advance agreement:

Effective February 27, 1995, FAR 31.205-6(o)(2)(iii) required contractors to use the FAS 106 accounting method to accrue cost of PRB plans. FAR 31.205-6(o)(3) requires that, to be allowable, PRB costs must be funded by the contractor's federal income tax return due date. However, Northrop Grumman's accounting method failed to fund the entire amount of the FAS 106 costs measured and assignable to prior accounting periods. These unfunded prior period costs are not allowable in future accounting periods.

(R4, tab 8) By letter to the government dated 2 October 2006, appellant disputed the DCE's position that the unfunded, prior period PRB costs were unallowable (R4, tab 9).

17. By letter dated 23 October 2006, appellant advised the DCE of preliminary CAS basis dollar impact changes by sector and year resulting from the soon-to-be-announced Plan design change that capped retiree health care costs (R4, tab 10). On 3 November 2006, NGC also formally notified the DCE in writing of NGC's switch from DEFRA to FAS 106 (R4, tab 11).

18. On 8 June 2007, DCAA issued a report addressing NGC's post retirement benefit expense projections and allocations for 2007-2011 forward pricing. Insofar as pertinent, DCAA provided the following audit evaluation:

> FAR 31.205-6(o) provides the contractor with a choice of three accounting methods to measure and assign PRB costs to accounting periods: (1) pay-as-you-go method, (2) terminal funding method, or (3) accrual accounting method. The only acceptable accrual accounting method is the method in accordance with generally accepted accounting principles, i.e., FAS 106, as specified by FAR 31.205-6(o)(2)(iii), which states that "Accrued PRB costs shall be – (A) Measured and assigned in accordance with generally accepted accounting principles. However, the portion of PRB costs attributable to the transition obligation assigned to the current year that is in excess of the amount assignable under the delayed recognition methodology described in paragraphs 112 and 113 of Financial Accounting Standards Board Statement 106 is unallowable." *From February 27, 1995 until November 1, 2006, the Northrop Retiree Medical and Life Plan costs were not measured and assigned in accordance with FAR 31.205-6(o)(2)(iii).* [Emphasis added]

7

Prior to November 1, 2006, Northrop Grumman used a method and assumptions in compliance with DEFRA to fund the PRB costs. This has caused the historical PRB costs to be less than the amount that would have been measured and assigned in accordance with FAR 31.205-6(o)(2)(iii). Northrop Grumman failed to fund the entire amount of FAS 106 measured PRB costs and, as a result, the unfunded FAS 106 costs are not allowable in future accounting periods, in accordance with FAR 31.205-6(o)(3), which states "To be allowable, PRB costs must be funded by the time set for filing the Federal income tax return or any extension thereof.... PRB costs assigned to the current year, but not funded, paid or otherwise liquidated by the tax return due date as extended are not allowable in any subsequent year."...

We calculated total unallowable costs of $377.7 million from February 27, 1995 through October 31, 2006 as the difference between the DEFRA funded amounts and amounts calculated using the FAS 106 methodology....

(R4, tab 14 at 74)

19. On 26 July 2007, the DCE issued a Notice of Intent to Disallow the disputed, unfunded PRB costs at issue. This notice adopted the DCAA position above. (R4, tab 15) NGC submitted its objections to this Notice on 21 September 2007 (R4, tab 16). The government issued its Final Determination, dated 9 April 2008, reaffirming its position (R4, tab 17).

20. On 11 July 2008, the DCAA issued Audit Report No. 4731-2008F17900002, "Review of Northrop Grumman Corporation's June 2008 Briefing in Response to the Final Determination on the Allowability of Northrop Retiree Health Plan Costs" (R4, tab 21). In the audit report, DCAA revised questioned amounts and concluded that $253,361,512 in unfunded PRB costs were unallowable (*id.* at 110). While appellant used FAS 106 to accrue PRB costs for purposes of its financial reporting each year, DCAA did not use those same figures to calculate the disallowance. Rather, it used recalculated FAS 106 figures provided by appellant to reflect the delayed recognition/amortization of appellant's FAS 106 transition obligation as required by the FAR (tr. 2/14-15).[2]

---

[2] The correctness of the figures used by DCAA to derive the disallowance figure goes to quantum, which is not before us.

21. NGC submitted a certified claim to DCMA on 20 May 2010, challenging the Final Determination that disallowed the disputed unfunded PRB costs. Because the 26 July 2007 Notice of Intent to disallow costs and the 9 April 2008 Final Determination to disallow costs did not list any affected contracts, appellant used Contract No. N68936-05-C-0059 as a "test" contract that would determine the allowability of $6,232.11 for purposes of the claim and any appeal that might be necessary. (R4, tab 22) The test contract was a cost-type contract that contained the contract clause entitled FAR 52.216-7, ALLOWABLE COST AND PAYMENT (DEC 2002), which insofar as pertinent, made government payments subject to the allowability provisions of FAR Subpart 31.2 in effect on the date of contract award and the terms of the contract (R4, tab 1).

22. The test contract was awarded effective 22 September 2005 (R4, tab 1). As of that date FAR 31.205-6(o) had been re-formatted, but was identical in all material respects to the 1995 FAR version above with regard to the issues pertinent here. The 2005 regulation stated:

> (2) To be allowable, PRB costs shall be incurred pursuant to law, employer-employee agreement, or an established policy of the contractor, and shall comply with paragraphs (o)(2)(i), (ii), or (iii) of this subsection.
>
> ....
>
> (iii) *Accrual basis*. PRB costs are accrued during the working lives of employees. *Accrued PRB costs shall be* –
>
>> *(A) Measured and assigned in accordance with generally accepted accounting principles.* However, the portion of PRB costs attributable to the transition...under the delayed recognition methodology described in paragraphs 112 and 113 of Financial Accounting Standards Board Statement 106 is unallowable. The transition obligation is defined in Statement 106, paragraph 110;
>>
>> (B) Paid to an insurer or trustee to establish and maintain a fund or reserve for the sole purpose of providing PRB to retirees; and

9

(C) Calculated in accordance with generally accepted actuarial principles and practices as promulgated by the Actuarial Standards Board.

(3) *To be allowable, PRB costs must be funded by the time set for filing the Federal income tax return or any extension thereof, or paid to an insurer, provider, or other recipient by the time set for filing the Federal income tax return or extension thereof. PRB costs assigned to the current year, but not funded, paid or otherwise liquidated by the tax return due date as extended are not allowable in any subsequent year.* [Emphasis added]

(Stipulation filed 4 September 2013)

23. The DCE issued a contracting officer's final decision on 18 February 2011 denying NGC's claim (R4, tab 23). This appeal followed.

24. Under DoD regulations, the CO is responsible for determining the allowability of insurance and pension costs under the cost regulations, and is assisted in this endeavor by DCAA auditors and DCMA insurance/pension specialists, the latter of whom perform contractor insurance pension reviews (CIPR). DFAS 242.7301(a). In this case there was an internal disagreement between CIPR and DCAA representatives over the allowability of the unfunded PRB costs in subsequent years.

25. CIPR representatives were of the opinion—consistent with that of appellant—that FAS 106 measurements constituted a ceiling, and that the difference between the unfunded FAS 106 measurement and the funded DEFRA measurement was not unallowable in future accounting periods under the regulation (tr. 1/138). An internal CIPR technical paper supported the CIPR position, but this paper was not official DCMA policy (tr. 1/175). DCAA disagreed with the CIPR team, and held that under Section (o)(3) the difference between the unfunded FAS 106 measurement and the funded DEFRA measurement was unallowable in future accounting periods under the regulation. It was this latter view that was ultimately adopted by the CO.

26. The record also reflects that in 2007 the then-current DCMA DCE expressed an opinion—within the government—consistent with that of appellant and the DCMA CIPR team (R4, tab 13). His opinion was challenged by his superior, the DCMA Deputy Director Cost & Pricing, Director Defense Corporate Executive Center, who expressed approval of the DCAA position in an email dated 14 June 2007:

> I think the position is that the cost principle, while possibly unfair, is clear....

10

> [S]eems like the company knew the costs had to be assigned
> to the appropriate years per FAS 106 because of theri [sic]
> financial reporting, so the fact that they charged less than this
> using DEFRA was a choice they made.
>
> [Was] the fact that we let them use DEFRA in effect a
> commitment to recognize unfunded FAS 106 costs later? I
> don't see how this would be so unless they have some
> documentation to that effect.

(App. supp. R4, tab 55) It was this position that was ultimately adopted by the CO.

27. At trial, appellant presented an expert report from an actuary who, *inter alia*, expressed an opinion on the interpretation of the cost regulation and its relationship with CAS 416 from an actuarial perspective, consistent with the allowability of the unfunded PRB amounts (app. supp. R4, tab 86). He also expressed the opinion that since Plan cost modifications in 2006 capped future health care cost increases, the disputed unfunded PRB costs here–which represented the anticipated cost increases in accordance with FAS 106 calculations–would never be incurred (*id.* at 10). According to NGC's expert:

> The Plan amendments that NGC adopted effective
> November 1, 2006 "capped" the benefits in a manner that
> eliminated virtually all PRB costs associated with future
> increases in health care costs. Because the value of the
> eliminated Plan benefits exceeds the amount of the PRB costs
> that the Government alleges will be unallowable on and after
> November 1, 2006, the "unallowable" costs that are the
> subject of this appeal have been completely eliminated.
> [Footnote omitted]

(*Id.*)

28. This expert opinion appears inconsistent with testimony that the disputed PRB costs appeared in NGC's incurred cost submission in 2007 and in subsequent years (tr. 2/64-65).

29. In or around 2002, the U.S. General Accounting Office (GAO) conducted a two-year review of PRB costs of NGC and other major contractors for calendar years 1999-2000. This review was made in response to a Congressional inquiry that "expressed concerns that government contractors may be receiving undeserved financial benefits by reducing retiree health benefits that were paid for under government contracts" (app. supp. R4, tab 22 at 1). Based upon this review, the GAO did not find

11

this to be the case. In summary, the GAO concluded that the government identified only minor problems with the contractors' PRB costs during these years; it did not question any projected forward pricing rate proposals; and while certain assumptions used to project costs were questioned, the impact was negligible (*id.* at 5).

30. Although cited by appellant in its brief and addressed at the trial, we give this GAO review little, if any, weight with respect to the allowability of the costs in issue under the FAR.

## DECISION

While the parties vigorously argue the merits of their respective interpretations of the cost regulation, appellant's acknowledgment in its post-hearing brief excerpted below – consistent with the evidence of record – goes far to resolve the issue before us, i.e., whether appellant's practices violated the governing cost regulation in the FAR:

> While FAR requires that PRB costs be accrued using GAAP
> [FAS 106]...there is no dispute that the DEFRA method did
> not comply with GAAP requirements....

(App. br. at 38) We agree with this statement. We conclude that appellant's use of the DEFRA method violated Section (o)(2) of the cost regulation for purposes of recovering amounts that were not funded under Section (o)(3) below.[3]

Not only did the FAR require that PRB costs be accrued using GAAP/ FAS 106 under Section (o)(2), but Section (o)(3) required these costs be timely funded. Reading the allowability Sections (o)(2) and (o)(3) together, the "PRB costs assigned to the calendar year" in Section (o)(3) must refer back to those costs required to be "assigned" under Section (o)(2), that is, the PRB costs that were required to be measured and assigned in accordance with GAAP/FAS 106. We read these sections together to require that appellant's Plan PRB costs must be measured and assigned under GAAP/FAS 106 and those same FAS-measured and assigned costs must be timely funded. Since appellant did not measure and assign its Plan PRB costs in accordance with GAAP/FAS 106, violating Section (o)(2), it perforce violated Section (o)(3).

Section (o)(3) provides that those PRB costs not timely funded "shall not be allowable in any subsequent year." The disputed amortized PRB costs here – part of the

---

[3] Given NGC's acknowledgement, we need not address the government's theory that appellant did in fact measure and assign its Plan PRB costs in accordance with Section (o)(2) – for purposes of its financial reporting – but failed to timely fund all such costs in violation of Section (o)(3).

12

transition obligation engendered by NGC's switch to FAS 106 in late 2006 – were not timely funded by appellant, and hence were unallowable in subsequent years.

Appellant contends that it met Section (o)(3) by fully funding what it assigned, i.e, its DEFRA amounts. But this interpretation ignores the express requirement of Section (o)(2), i.e., that the amount must be measured and assigned in accordance with GAAP/FAS 106. As appellant admits, it did not measure and assign its Plan PRB costs under its government contracts in accordance with GAAP/FAS 106.

Appellant also contends that the Section (o)(2) GAAP/FAS 106 measurement must be interpreted to serve as an allowability "cap" or "ceiling" to those amounts it otherwise annually funded under Section (o)(3) pursuant to DEFRA and without prejudice to the amortization of those FAS 106 costs it did not annually fund. However, no such language is contained in the regulation. We must enforce the regulation according to its plain terms and not insert additional words or phrases to alter an otherwise plain and clear meaning. *Tesoro Hawaii Corp. v. United States*, 405 F.3d 1339, 1346 (Fed. Cir. 2005).

Alternatively, appellant contends that the government's actions and/or inactions should estop the government from asserting this disallowance under the cost regulation. Appellant's burden to prove equitable estoppel against the government is a heavy one. *RGW Communications, Inc. d/b/a Watson Cable Company*, ASBCA Nos. 54495, 54557, 05-2 BCA ¶ 32,972 at 163,335. We recently set out this burden of proof as follows:

> Equitable estoppel requires a showing of: 1) misleading conduct leading another to reasonably infer that rights will not be asserted against it; 2) reliance on this conduct; and 3) material prejudice as a result of this reliance. *Mabus v. General Dynamics C4 Systems, Inc.*, 633 F.3d 1356, 1359 (Fed. Cir. 2011). *When estoppel is asserted against the government, a showing of affirmative misconduct is required in addition to these elements. United Pacific Insurance Co. v. Roche*, 401 F.3d 1362, 1366 (Fed. Cir. 2005). [Emphasis added]

*SplashNote Systems, Inc.*, ASBCA No. 57403, 12-1 BCA ¶ 34,899 at 171,609. Appellant has failed to meet its heavy burden here.

First, appellant has not shown any government misleading conduct with respect to the unfunded PRB costs in issue from which appellant could reasonably infer that the government would not assert its rights against appellant with respect to these costs. The dispute here involves the allowability of the unfunded, prior year PRB Plan costs arising out of appellant's switch to accruing PRB costs in accordance with FAS 106 in 2006.

There is no evidence of record showing that the government was aware of appellant's plan to make this switch prior to 2006, so by definition the government could not have earlier represented – or misrepresented – its position to appellant with respect to this plan and the associated unfunded PRB costs. None of the DCAA or DCE documents cited by NGC address the issue of these costs.

We further note that the DCE letter of 13 April 1998 was qualified and reserved the government's rights in "instances of noncompliance not detected during this review" (finding 9). Reservation-type language was also found in the DCE letter dated 20 April 2000 (finding 10). The DCE letter dated 26 August 2003 was based upon a "FAR 30.602-3" review, that is, a review regarding whether certain disclosure statement revisions (none of which are relevant here) were voluntary accounting practice changes (finding 11).

To the extent that appellant relied upon such letters as a government "stamp of approval" on appellant's 2006 proposal to switch to FAS 106 and to amortize the unfunded, prior year PRB costs, such reliance was unreasonable. The government did not mislead appellant with respect to the allowability of the unfunded PRB costs in dispute here, nor did the parties have a course of dealing with respect to them.

Appellant has also failed to prove affirmative misconduct on behalf of the government. Neither the Federal Circuit nor the Board has developed a litmus test for affirmative misconduct. Such a determination is necessarily fact-dependent. However, that the courts have imposed this additional requirement when a party seeks to invoke equitable estoppel against the government underscores two self-evident points: 1) that the moving party to make its case against the government must prove something more than would be necessary against a private party; and 2) that this added requirement must, perforce, be of a nature more compelling than the conduct that would otherwise apply against a private party. *See, e.g., RGW Communications*, 05-2 BCA ¶ 32,972 at 163,336 (referencing deliberate lies, a pattern of false promises, or intentional deception as examples of affirmative misconduct).

Appellant has failed to show any such affirmative misconduct here with respect to the allowability of the unfunded PRB costs in issue. There is nothing in the record showing that the government misrepresented or provided appellant incorrect advice regarding how it would treat appellant's switch to FAS 106 and the related unfunded PRB costs. Indeed, when NGC first sought an advance agreement on the issue, the government rejected it. While the DCAA did not call to appellant's attention in the 1990s the possible legal consequences of its actions in the event it moved from DEFRA to FAS 106 in the future, we fail to see that DCAA was obligated to provide such advice, and do not believe that any such failure constituted affirmative misconduct so as to bar the government's disallowance here. *See Zacharin v. United States,* 213 F.3d 1366, 1371-72 (Fed. Cir. 2000) (failure to call plaintiff's attention to possible legal

14

consequences of its actions does not constitute affirmative misconduct where no evidence of providing incorrect legal advice or related misrepresentations).

Appellant argues that it was affirmatively misled by the government's repeated notifications that its use of DEFRA was FAR compliant. We disagree for a number of reasons. First, none of the DCE responses to appellant's disclosure statements cited by appellant specifically represented, without qualification, that DEFRA was FAR compliant. The government did indicate, after a review of a disclosure statement, that no FAR violations were noted, but these responses were, for the most part qualified, and reserved government rights on further review.

Moreover, the fact that the government allowed appellant's yearly PRB costs calculated under DEFRA was not a misrepresentation, nor was it improper under the cost regulations (nor is the government currently questioning these costs). The government's decision not to disallow these DEFRA amounts was consistent with FAR 31.201-2(c), which provides for the disallowance of costs in excess of those generated by consistent FAR practices.[4] Appellant's annual DEFRA-funded costs were not in excess of those generated by appropriate FAR practices; they were indisputably less than such costs. Hence, the allowance of these lesser amounts was proper under the regulations, and perforce was not a misrepresentation or affirmative misconduct.

We have duly considered all of appellant's remaining arguments, but are not persuaded that they support a finding of affirmative misconduct. We conclude that appellant has not proven equitable estoppel against the government so as to bar the government's recovery here.

Nor is the government barred by the equitable doctrine of laches. The doctrine of laches serves to bar a claim where the claimant has unreasonably and inexcusably delayed the assertion of its claim resulting in economic prejudice or the impairment of the ability to mount a defense. *JANA, Inc. v. United States*, 936 F.2d 1265, 1269 (Fed. Cir. 1991). Initially, we note that the government is not the claimant here for purposes of the laches doctrine. Appellant first sought to change methodologies from DEFRA to FAS 106 in 2006, which among other things, resulted in the need to amortize the disputed unfunded PRB costs from prior years as part of a transition obligation. Based upon a DCAA audit dated 8 June 2007, the government issued a notice of intent to disallow the unfunded costs; on 21 September 2007 appellant objected, and DCMA issued a Final Determination to disallow the costs on 9 April 2008. NGC filed a claim on

---

[4] FAR 31.201-2, DETERMINING ALLOWABILITY, provides at (c) as follows: When contractor accounting practices are inconsistent with this Subpart 31.2, costs resulting from such inconsistent practices in excess of the amount that would have resulted from using practices consistent with this subpart are unallowable. (Emphasis added). *See also* note 5, *infra*.

15

20 May 2010 and the DCE issued a final decision denying the claim on 18 February 2011. Assuming *arguendo*, that the equitable doctrine of laches may be applied against the government under these circumstances, *see JANA* at 1269, we believe that the claim was not unreasonably or inexcusably delayed.

Appellant also argues that its interpretation of the regulation was, and still is supported by certain government actuaries on the CIPR team. However, in our view, the opinion of these government actuaries does not trump the plain language of Sections (o)(2) and (o)(3) of the cost regulation.

Appellant also notes that since its various disclosure statements provided that appellant measured and assigned PRB costs in accordance with DEFRA, it was obligated under CAS to follow these disclosed practices. However, this dispute is not over a CAS violation[5] but rather over the allowability of the unfunded transition obligation under the FAR 31 cost principles. *See* FAR 31.201-2(a)(5) (factors to determine allowability include compliance "with any limitations set forth in this subpart"). Appellant did not comply with FAR 31.205-6(o) here.

Finally, appellant contends that due to Plan modifications in 2006 that capped future increases in health care costs, the disputed unfunded PRB costs here – which according to appellant essentially represented such increased future health care costs per FAS 106 – will not be incurred and as such, the government has no basis to disallow them. According to appellant's brief: "It is axiomatic that the Government cannot disallow costs that have never been and will never be claimed or incurred" (app. br. at 66).

We accept this axiom, but it is unclear whether it applies in this case. The record reflects testimony that the disputed, unfunded PRB costs were included in appellant's incurred cost submission in 2007 and in years thereafter, and hence these costs were purportedly "claimed" by appellant in these years (finding 28). However, these incurred cost submissions are not of record.

Neither party addressed quantum in any detail in this entitlement proceeding. While we believe appellant's contention is conceptually sound, we need a better

---

[5] The government conceded in its Answer, ¶ 10, that NGC's <u>funding</u> of the Plan based upon the tax deductible amount in accordance with DEFRA was in compliance with CAS 416, Accounting for Insurance Costs. Indeed, the government never questioned – under CAS or otherwise – the lesser-funded DEFRA amounts that were funded by appellant each year prior to 2007. It only questioned the <u>unfunded</u> amounts when appellant sought to change its practice and switched to FAS 106 for government contract purposes. Appellant has shown no conflict between the CAS and FAR in this respect.

developed record to address whether the contention is grounded in fact; whether the unfunded PRB costs as part of the amortized transition obligation were included and "claimed" in appellant's incurred cost submission in 2007 and beyond; and if so, how the government treated them, and whether any of these matters impacted quantum. Assuming, *arguendo*, that NGC is due a credit based upon the elimination of the future health care cost increases, the amount of that credit is also a quantum issue, as is the DCAA calculation in support of the disallowance. If this case is not settled, these quantum issues will have to be addressed by the Board at a later time.

## CONCLUSION

We have duly considered appellant's remaining arguments but are not persuaded by them. For reasons stated and based upon the record before us, we conclude that FAR 31.205-6(o) supports the government's disallowance of the unfunded PRB costs under this test contract. We remand to the parties to determine quantum.

The appeal is denied.

Dated: 16 January 2014

JACK DELMAN
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

I concur

MARK N. STEMPLER
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

REBA PAGE
Administrative Judge
Acting Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 57625, Appeal of Northrop Grumman Corporation, rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals